# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| STACY BROWN, as Next Friend for T.H., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case number 4:08cv0298 TCM |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying the application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383b, filed on behalf of T.H. ("Plaintiff") by his mother, Stacy Brown, is before this Court[1] for disposition. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Ms. Brown applied for SSI on Plaintiff's behalf in December 2003, alleging he was disabled as of October 30, 2003, due to a speech impediment. (R.[2] at 49-50.) This application was denied initially and following an administrative hearing in May 2005 before

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2] "R." refers to the administrative record filed by the Commissioner with his answer.

Administrative Law Judge ("ALJ") Robert B. O'Blennis.  (Id. at 14-19, 28, 30-33, 189-200.)
The Appeals Council denied review, effectively adopting the ALJ's decision as the final
decision of the Commissioner.  (Id. at 5-8.)

## Testimony Before the ALJ

Ms. Brown, represented by counsel, was the only witness to testify at the hearing.
Plaintiff was present, but did not testify.

Ms. Brown testified that Plaintiff lives with her; there are no other people in the
household.  (Id. at 193.)  He is in kindergarten and receives speech therapy at school twice
a week for thirty minutes.  (Id. at 194.)  He also sees Lynn Bock[3] at Cardinal Glennon
Children's Hospital ("Cardinal Glennon's") once a week for speech.  (Id.)  His teachers
wanted him to go to summer school to prepare for first grade.  (Id.)  He would work on
reading, vocabulary, spelling, and math.  (Id. at 197.)  She wanted him to participate in a
summer sport program, but he was too young.  (Id. at 196.)  He might attend a summer camp.
(Id.)  Before kindergarten, he went to Kim's Kids Preschool for a year.  (Id. at 195.)

Plaintiff does not have any other problems and can take of his personal needs.  (Id.)
He just learned how to ride a bicycle.  (Id. at 196.)  He sometimes plays with other children
in the neighborhood.  (Id.)

Plaintiff does not take any medications.  (Id.)

---

[3]Although the transcript reads "Bach," the proper spelling is "Bock."

## Medical, School, and Other Records Before the ALJ

When applying for SSI for her son, Ms. Brown completed a Function Report for children ages three to six.[4]  (Id. at 54-61.)  Plaintiff had no problems seeing or hearing; his physical abilities were not limited; and his speech impediment did not affect his habits and ability to take care of his personal needs.  (Id. at 55, 59, 60.)  He was not totally unable to talk; however, his ability to communicate was limited in that he did not "[u]se[ ] complete sentences of more that 4 words most of the time," "[t]alk[ ] about what he . . . [wa]s doing," "[t]ake[ ] part in conversations with other children," "tell a made up or familiar short story," "answer questions about a short read-aloud children's story or TV story," or "deliver simple messages such as telephone messages."  (Id. at 56-57.)  He was limited in his progress in understanding in that he could not "[i]dentify most colors . . . and shapes," remember his telephone number, "define common words," "read capital letters of the alphabet," or "understand[ ] a joke."  (Id. at 58.)  His impairment did affect his behavior with other people in that he did not play board games.  (Id. at 59.)  He could not pay attention and stick with a task for longer than 30 minutes.  (Id. at 60.)

On a separate, Daily Activities Report, Ms. Brown reported that Plaintiff would "lash[ ] out sometimes when other people can't understand what he says."  (Id. at 68.)  He became  frustrated when he could not say what he wanted to, could not get the words out, or could not put words together to say what he wanted.  (Id. at 69.)  He attended Kim's Kids

---

[4]Plaintiff was born on November 2, 1998, and would have had his fifth birthday the month before Ms. Brown completed the form.

preschool. (Id.) It was hard on him when other children got answers out faster than he did. (Id.) His chores included keeping his room clean. (Id. at 70.) He tended to be quiet with adults because he was embarrassed to talk in front of people. (Id.) People would laugh at him. (Id.) They did not take the time to hear him out, but would cut him off and tell him to be quiet. (Id.) Everyday was a challenge for him when he tried to talk. (Id. at 71.)

Plaintiff's school records before the ALJ consisted of those relating to his receipt of special education services.

When Plaintiff was seven years old and in kindergarten, he had the necessary assessments for the development of an Individualized Education Program ("IEP"). (Id. at 87-114.) He was found to have a language impairment in the areas of semantics, syntax, and morphology (the structure, form, or variation in form of words). (Id. at 89.) This impairment impacted his ability to follow oral directions, to ask and answer questions correctly, to understand and define vocabulary, and to participate in class discussions. (Id.) His strengths included that he was cooperative, eager to learn, and a hard worker. (Id.) His cognitive functioning was in the low average range with a significant split in scores between visual and verbal. (Id.) His short-term and auditory memory skills were weak; he required multiple exposure to information. (Id.) He had difficulties understanding word problems and ordinal position and in writing from directions. (Id. at 90.) He spoke primarily in two to three word utterances. (Id.)

The foregoing findings were based on a Diagnostic Report that had been prepared the month earlier. (Id. at 104-09.) A meeting had been held to address concerns about Plaintiff's

"cognition, adaptive behavior, reading, math, written expression, and language." (<u>Id.</u> at 105.) It was noted that Plaintiff received thirty minutes weekly of speech and language services at Cardinal Glennon. (<u>Id.</u>) There were no other health concerns; he was not on any medication. (<u>Id.</u>) His mother had reported that he had difficulty performing chores independently and had trouble remembering, concentrating, expressing his ideas, demonstrating self-control, becoming frustrated, and completing his homework. (<u>Id.</u>) He also had problems with self-confidence. (<u>Id.</u>) He was unable to give details when asked. (<u>Id.</u>) Although he had been receiving language therapy from Cardinal Glennon since June 2004, she noted little improvement. (<u>Id.</u>) He was still unable to sound out words and would forget what he learned. (<u>Id.</u>) He was unable to follow multi-step directions, but could follow one-step directions. (<u>Id.</u> at 106.) He would talk socially with peers during recess and would play appropriately with them. (<u>Id.</u>) He was more comfortable in the classroom at the time of the report, January 2005, than he had been at the beginning of the school year. (<u>Id.</u>) Then, he had hit others, frequently struggled with blending sounds, and needed a lot of repetition. (<u>Id.</u>) His strengths included recognizing his letters and being able to write his first and last name. (<u>Id.</u>) Also, he would keep trying even when school work was difficult for him. (<u>Id.</u>) Still, he was functioning in lower third of his class in the preacademic areas. (<u>Id.</u>) On the Stanford-Binet Intelligence Scale ("Stanford-Binet"), he had a nonverbal intelligence quotient ("IQ") of 84, a verbal IQ of 69, and a full scale IQ of 76.[5] (<u>Id.</u> at 107.)

---

[5]The Stanford-Binet and the Vineland Adaptive Behavior Scale were administered in June 2004. The other tests cited were administered in February 2005.

The test had a mean of 100 and a standard deviation of 15. (<u>Id.</u>) On the Vineland Adaptive Behavior Scale, he was below average. (<u>Id.</u>) His scores on the Learning Disability Evaluation Scale ranged from two on thinking, three on listening, to seven on speaking and eight on spelling. (<u>Id.</u> at 108.) His learning quotient was 78, which was below average. (<u>Id.</u>) On the Wechsler Individual Achievement Test – II ("WIAT-II"), he placed at a grade level equivalent to prekindergarten in basic reading, spelling, listening comprehension, and oral expression and in the range of kindergarten to second grade in numerical operations. (<u>Id.</u>) These two tests also had a standard deviation of 15 and a mean of 100. (<u>Id.</u>) His composite score on the Test of Language Development – Primary was 64 ; the average range was between 90 and 110. (<u>Id.</u> at 109.)

It was noted that during the testing, Plaintiff demonstrated adequate topic maintenance. (<u>Id.</u> at 110.) He required some "repetition of verbally-stated test items." (<u>Id.</u>) Although his response rate was adequate for most tasks, some of his verbal responses did not make sense. (<u>Id.</u>) His full scale IQ was within the borderline range of cognitive ability. (<u>Id.</u>) A 15-point difference, however, between his verbal and performance IQ scores rendered the full scale IQ score inappropriate for criterion level determination. (<u>Id.</u>) His nonverbal IQ of 84 suggested significantly higher cognitive functioning and a better learning potential. (<u>Id.</u>) His verbal abilities varied significantly. (<u>Id.</u>) For instance, he demonstrated low average ability to understand spatial concept words and to do verbal math reasoning tasks. (<u>Id.</u>) "His use of verbal reasoning, long term memory to define vocabulary words, and short-term auditory memory were significantly weak." (<u>Id.</u>) When responding to questions, he

often spoke in phrases and not in complete sentences. (Id.) Although he was sometimes distracted during testing, he could easily be directed back on track. (Id. at 111.) His scores on The Test of Language Development indicated that his oral language skills in the areas of semantics, syntax, and morphology were significantly below average for his chronological age. (Id.) The Structured Photographic Expressive Language test was given to assess his ability to use common grammatical forms in various contexts. (Id.) He demonstrated difficulties with plural forms, verb tense forms, possessive pronouns, and formulating questions. (Id.) His spontaneous conversation skills were lacking in the ability to understand and answer most "wh" questions. (Id.) He was unable to describe or explain a familar movie or sequence any basic events. (Id.) He had difficulty following oral directions, communicating thoughts and ideas, and understanding verbal instructions and vocabulary. (Id.) Math weaknesses included difficulties recognizing two digit numbers, identifying shapes, understanding word problems, ordinal position, and writing dictated numbers without visual cues. (Id. at 112.) He wrote as well as expected for his cognitive abilities. (Id.) "Language skills, which consist[ ] of oral expression and listening comprehension tasks, measured in the borderline range, but within cognitive expectancy." (Id.) His mother had rated inattention as a moderate concern and hyperactivity-impulsivity as of no concern. (Id.) His teacher's rating was the opposite. (Id.)

The IEP plan was that Plaintiff was to receive 60 minutes of language therapy each week in a special education classroom. (Id. at 90, 95.) He was to increase his vocabulary by completing classroom related tasks with 70% accuracy. (Id. at 91.) He was to increase

his ability to answer questions by completing tasks with 70% accuracy and was to increase his ability to produce complete simple sentences by producing complete, simple sentences. (Id. at 91- 92.)

In July, Plaintiff's parents received a copy of his results on the TerraNova Achievement Test. (Id. at 178-80.[6]) This test had been given to all students at his school in kindergarten, first grade, and second grade. (Id. at 178.) Plaintiff had taken the test in the spring of first grade. (Id.) The test had five sections: reading, vocabulary, reading composite, language, and word analysis. (Id. at 179.) Plaintiff was in the average range in vocabulary, language, and word analysis. (Id.) He was below average in reading and reading composite. (Id.)

Another IEP was completed in November 2006 when Plaintiff was in the second grade. (Id. at 173-76, 183-86.) The diagnosis was "language impairment in the areas of semantics, syntax, and morphology." (Id. at 174.) This impairment affected Plaintiff's "ability to clearly and effectively understand what is being said to him and express himself verbally and ready [sic] fluently." (Id.) He needed to continue to increase his vocabulary, his ability to answer "wh" questions, his sentence length, his story event ordering, his story retell, his ability to follow multi-step directions, his ability to read decoding, his fluency, and his comprehension. (Id.) He appeared to learn best with an approach using both visual and verbal modalities. (Id.) He was to be in the general education setting for all subjects and was to receive 90 minutes of language therapy each week. (Id.) His strengths were in peer

_____

[6]Pages 177, 181, and 182 are duplicates.

interaction, cooperation, effort, motivation, and parental support. (<u>Id.</u>) Since his last IEP, he had increased his vocabulary of familiar items, his sentence length, his answers to "wh" questions, and his ability to follow multi-step directions in the special education setting. (<u>Id.</u> at 175.)

The ALJ also had before him Plaintiff's medical records. With the exception of an unremarkable well-child exam in September 2003, when Plaintiff was almost five years old, <u>see id.</u> at 124-27, and treatment for a cold the next month, <u>id.</u> at 130, Plaintiff's medical records related to his language impairment.

When his pediatrician, Earline Brownridge, M.D., saw Plaintiff for his cold it was reported that his daily stuttering was not getting any better. (<u>Id.</u>) She referred him to a speech specialist. (<u>Id.</u>)

Nine days later, pursuant to that referral, Plaintiff was seen at St. Louis Children's Hospital for an initial speech and language evaluation. (<u>Id.</u> at 131-33.) During the two-hour evaluation, Plaintiff was given several tests. (<u>Id.</u>) His score on the Preschool Language Scale – 4 placed him in the percentile rank of 23 and at an age equivalency of 4 years, 3 months.[7] (<u>Id.</u> at 131.) He demonstrated age appropriate skills of "providing a response to wh-questions . . . , repeating sentences, completing analogies . . . , and using adjectives to describe objects . . . ." (<u>Id.</u>) His ability to formulate questions and name items into categories placed him in the 5 year 0 month to 5 year 5 months range.[8] (<u>Id.</u>) On the other

---

[7]Plaintiff was three days shy of his fifth birthday.

[8]<u>See</u> note 6, supra.

hand, Plaintiff "demonstrated difficulties in describing similarities between objects . . . , completing similes . . . , repairing sentences that are semantically incorrect . . . , and defining words . . . ." (Id. at 132.) These skills were in the 5-year 6-month to 5-year 11-month range. (Id.) There were no concerns about his expressive language. (Id.) On the receptive portion of the test, however, Plaintiff's score placed him in the percentile rank of 8 with an age equivalency of 3 years, 8 months. (Id.) He was able to "understand expanded sentences . . . , understanding [sic] qualitative concepts . . . , and understand the difference between night and day." (Id.) These abilities placed him in the 4-year 0-month to 4-year 5-month age range. (Id.) He had difficulties in "understanding spatial concepts . . . , understanding sentences that contain nouns + 2 adjectives, and understanding qualitative concepts." (Id.) These difficulties placed him in the 4-year 6-month to 4-year 11-month range. (Id.) Before answering the questions, Plaintiff would say "uh . . ., uh. . . ." (Id.; alterations in original.) Plaintiff needed time to process the information before asking a question. (Id.) His total language score was 82, percentile rank of 12, and age equivalency of 4 years, 0 months. (Id.) His expressive skills were greater than his receptive skills. (Id.)

To assess Plaintiff's speech sounds, he was given the Goldman-Fristoe 2 Test of Articulation. (Id.) An average test score was 100; his score was 101. (Id.) This placed him in the percentile rank of 33 and an age equivalency of 4 years, 11 months. (Id.) His intelligibility decreased at the sentence level. (Id.) Given the task of retelling a story told by the clinician in order to assess Plaintiff's fluency, Plaintiff was disfluent approximately 13% of the time. (Id.) It was questionable whether his disfluencies were secondary to

processing difficulties and were not a "true disfluency." (Id. at 133.) The clinician recommended once-weekly "[t]herapy targeting articulation at the sentence level, as well as further diagnostic therapy to address processing skills . . . ." (Id.) A diagnosis was deferred. (Id.) The prognosis was excellent. (Id.)

In June 2004, Dr. Brownridge referred Plaintiff to Cardinal Glennon Children's Hospital ("Cardinal Glennon's") for another speech and language evaluation. (Id. at 141-42.) Plaintiff was then 5 years, 7 months old. (Id. at 141.) His aunt reported that he had received speech therapy at St. Louis University's Department of Communication Disorders once a week for two months. (Id.) Plaintiff was given several tests, including the Clinical Evaluation of Language Fundamentals – Preschool; the Goldman-Fristoe 2 Test of Articulation; the Weiss Test of Intelligibility; and the Stuttering Prediction Instrument. (Id.) On the first test, his scores placed in the age equivalence of 3 years, 1 month. (Id.) In the second test, his scores placed him in the age equivalence of 5 years, 2 months. (Id.) He had 100% total intelligibility on the third test. (Id.) On the fourth, he was disfluent on 15% of his utterances in a 100-word sample, placing him in the mild severity range. (Id.) The diagnosis was receptive and expressive language disorder and stuttering disorder, secondary to his language disorder. (Id.) This disorder limited his family and peer interaction and his ability to process information. (Id. at 142.) Also, he was unable to clearly express his wants and needs and to follow directions or commands in a home or class room environment. (Id.) It was recommended that Plaintiff receive twice-weekly speech therapy. (Id.)

Plaintiff attended fifteen of the nineteen scheduled therapy sessions. (<u>Id.</u> at 143-44.) After seven sessions, he had met three of the four goals set at the initial evaluation; the fourth had not yet been addressed. (<u>Id.</u> at 143.) After the next eight sessions, he was making progress on the revised goals and on the fourth that was then being addressed. (<u>Id.</u> at 144.) The goals were addressing skills in the age range of 3 years, 6 months to 4 years, 6 months. (<u>Id.</u>) The prognosis was good. (<u>Id.</u>)

Following his language therapy sessions, Plaintiff underwent a psychoeducational evaluation at Cardinal Glennon's in December 2004 and January 2005 to rule out mental retardation. (<u>Id.</u> at 147-52.) His mother reported that his school was considering placing him in a classroom for mentally handicapped children. (<u>Id.</u> at 147.) His father thought Plaintiff would grow out of his language delays, as he had. (<u>Id.</u>) His mother was concerned he would not. (<u>Id.</u>) His father reported that Plaintiff had age-appropriate peer relationships and that his speech difficulties did not negatively affect his social development. (<u>Id.</u>) His mother, however, reported that he rarely played with other children, was difficult to understand, socially immature, and frustrated by his communication skills deficiencies. (<u>Id.</u>) Even so, he was doing well in kindergarten. (<u>Id.</u> at 151.) Plaintiff lived with both parents. (<u>Id.</u> at 147.)

Again, Plaintiff was given several tests. On the Wechsler Preschool and Primary Scale of Intelligence – III, he had a full scale IQ of 78, placing him in the borderline range of cognitive functioning. (<u>Id.</u> at 148.) His ability to process verbal information, an IQ of 74, and apply his knowledge also fell with the borderline range. (<u>Id.</u>) His performance on non-

verbal tasks involving perceptual organization, an IQ of 86, and his processing speed, an 85, were both in the low average range. (Id.) His non-verbal reasoning skills were "significantly better developed than his expressive verbal reasoning skills." (Id.) The 12-point difference between his verbal and performance IQs was statistically significant. (Id.) His full scale IQ score of 90 on the Leiter International Performance Scale – Revised ("Leiter") placed him in the average range of cognitive functioning. (Id. at 149.) This score was comparable to his performance IQ of 86 on the previous test. (Id.) His fluid reasoning skills were in the average range. (Id.) "[H]is skills in deductive reasoning, inductive reasoning, forming analogies, rule generation, part-to-whole relationships, perceptual organization, sequential organization, pattern recognition, and contextual knowledge [were] all equally developed." (Id.) On an Expressive Vocabulary Test, Plaintiff's score of 77 placed him in the moderately low range compared to other children his age. (Id. at 150.) On the Peabody Picture Vocabulary Test – Third Edition (PPVT-III), his score of 69 placed him in the extremely low range. (Id.)

Ms. Brown completed a Child Development Inventory Profile designed to assess Plaintiff's developmental skills in various areas of socialization. (Id.) Her answers indicated that his development was significantly delayed in all areas. (Id.) Her answers on the Vineland Adaptive Behavior Scale: Interview Edition placed Plaintiff's adaptive functioning in the area of communication in the low range, in the area of daily living skills in the moderately low range, and in the area of socialization skills in the adequate range. (Id.) Another questionnaire completed by Plaintiff's father indicated that Plaintiff had no clinically

significant elevations for such syndromes as depression, anxiety, social problems, and thought problems.  (Id.)

It was concluded that Plaintiff's expressive language was in the moderately low range and his receptive language was in the extremely low range.  (Id. at 151.)  His social functioning was in the adequate range; his daily living skills were in the moderately low range.  (Id.)

He was not mentally retarded.  (Id. at 151.)

He did have a mixed receptive-expressive language disorder.  (Id.)  His Global Assessment of Functioning[9] ("GAF") score was 62.[10]  (Id.)  It was recommended that, inter alia, his parents continue to seek supplemental speech and language services for him.  (Id.)

The ALJ also had before him a report and interrogatory answers by non-examining consultants.

In January 2004, Miriam Serfas, M.H.S., CCC/SLP,[11] completed a Childhood Disability Evaluation Form.  (Id. at 134-39.)  Plaintiff's impairments were a mild receptive

---

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[10]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic Manual at 34.

[11]A "CCC/SLP" is a certificate of clinical competence in speech language pathology.  (Id. at 154.)

language delay and mild disfluency (stuttering).  (Id. at 134.)  These impairments caused Plaintiff no limitations in the domains of moving about and manipulating objects, caring for himself, health and physical well-being, or attending and completing tasks.  (Id. at 136, 138.) They did cause a less than marked limitation in acquiring and using information and in interacting and relating with others.  (Id. at 138.)

Ms. Serfas also answered written interrogatories submitted to her by the ALJ in June 2005.  (Id. at 158-62.)  She had never examined Plaintiff; however, there was sufficient medical evidence in the record from which she could form an opinion about his medical status.  (Id. at 158.)  He had a language impairment in syntax, semantics, and morphology. (Id. at 159.)  This impairment did not meet or equal an impairment of Listing-level severity, including § 111.09.  (Id.)  This impairment did result in a marked limitation in his functioning in the domain of acquiring and using information and a less than marked limitation in the domain of interacting and relating to others.  (Id. at 160.)  The former was due to his language impairment.  (Id. at 162.)  The latter was "due to some concerns with pragmatic language function.  In general, [Plaintiff] appears to get along with both peers and adults adequately."  (Id.)

Two months after the administrative hearing, the ALJ submitted written interrogatories to Clayton L. Pettipiece, M.D., to answer in his capacity as a child psychiatrist.  (Id. at 167.)  Dr. Pettipiece responded, as had Ms. Serfas, that he had not examined Plaintiff but had sufficient medical evidence from which to form an opinion on his medical status.  (Id. at 168.)  Based on that evidence, Plaintiff had a mixed receptive-

expressive language disorder.  (Id.)  This impairment did not meet or equal an impairment of Listing-level severity.  (Id. at 169.)  This impairment did result in a marked limitation in his functioning in the domain of acquiring and using information and a less than marked limitation in the domains of attending and completing tasks and of health and physical well-being.  (Id. at 169-70.)

The ALJ forwarded Dr. Pettipiece's answers to Plaintiff's counsel, who could then submit his own interrogatories or request the opportunity to question the expert at a supplemental hearing.  (Id. at 115.)  Counsel requested that additional interrogatories be submitted to verify Dr. Pettipiece's address and whether he was in private practice.  (Id. at 121.)  Also, counsel questioned Dr. Pettipiece about whether Plaintiff had a valid verbal IQ between 61 and 70 and whether he still had a significant impairment of mixed expressive/receptive language disorder.  (Id. at 171.)  Dr. Pettipiece clarified the discrepancies in his addresses, affirmed that he was actively engaged in private practice, noted that Plaintiff's verbal IQ was 74 and was valid; and expected that Plaintiff's impairment had somewhat improved with treatment and school and would gradually resolve in the next three to four years.  (Id.)

## The ALJ 's Decision

After summarizing the three-step sequential evaluation procedure to be used when reviewing Plaintiff's application, see pages 18 to 20 below, the ALJ first determined that Plaintiff, in kindergarten at the time of the hearing, had not engaged in substantial gainful activity. (Id. at 16.)

The ALJ next summarized Ms. Brown's testimony, Plaintiff's medical and school records, and the non-examining consultants' reports. (Id. at 16-17.) He concluded that, regardless of the verbal IQ of 69 in June 2004, Plaintiff was not mentally retarded. (Id. at 17.) Indeed, after the June 2004 testing, he was said to probably have significantly higher cognitive functioning and was described eight months later as having low average cognitive skills. (Id.) His December 2004 and January 2005 IQ scores were above 70. (Id.) "Common sense dictates that one cannot manifest a higher degree of intelligence than what he possesses, although he can manifest a lower one." (Id. at 17-18.) The ALJ concluded that the higher scores were the more accurate ones. (Id. at 18.) The ALJ next noted that the higher scores were those obtained on the Leiter test and PPVT-III test – tests that the regulations state should be used when assessing a child's communication abnormalities[12] – and the lower was on the Stanford-Binet. (Id.)

---

[12]See 20 C.F.R. Pt. 404, Subp. P, App. 1, § 112.00D(15) (noting that the Leiter and PPVT-III tests may be used to test the IQ of a child with communication abnormalities).

Deferring to the consultants' opinions,[13] the ALJ found that even if Plaintiff did have a marked limitation in the domain of acquiring and using information, he did not have a marked, or extreme, limitation in any other domain. (Id.) At worst, he had a less than marked limitation in attending to and completing tasks or in interacting and relating with others. (Id.) He had no limitation in the domains of moving about and manipulating objects, of caring for himself, or of health and physical well-being. (Id.) He was not disabled within the meaning of the Act. (Id.)

## Legal Standards

Title 42 U.S.C. § 1382c(a)(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To decide whether a child satisfies this criteria, an ALJ employs a three-step sequential process. "First, the ALJ determines if the child is engaged in substantial gainful activity." **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 821 (8th Cir. 2008) (citing 20 C.F.R. § 416.924(b)). Second, if the child is not working, the ALJ "determines if the child has 'a medically determinable impairment(s) that is severe.'" **Id.** (quoting § 416.924(c)). "And, third, if the child's impairment is severe, the ALJ must then determine whether the impairment or combination

_____

[13]The ALJ opined that Plaintiff's language impairment would probably be overcome with a few more months of therapy.

of impairments meets or medically equals the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1." **Id.** (citing § 416.924(d)). <u>Accord</u> **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998). "An impairment is functionally equivalent to a listing when the impairment results in an 'extreme' limitation in one domain of functioning or a 'marked' limitation in two domains of functioning." **England v. Astrue**, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(a)). "A marked limitation in a domain is a limitation that seriously interferes with a child's ability to 'independently initiate, sustain, or complete activities.'" **Id.** (quoting § 416.926a(e)(2)(i)). Such limitation is "'more than moderate' but 'less than extreme.'" **Id.** (quoting § 416.926a(e)(2)(i)). An "extreme limitation" is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(3)(i)). The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. **Scott**, 529 F.3d at 821; **England**, 490 F.3d at 1019. "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'" **Id.** (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 805 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by

substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Scott**, 529 F.3d at 821; **England**, 490 F.3d at 1019; **Garrett**, 366 F.3d at 646. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **England**, 490 F.3d at 1019; **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).

<u>Discussion</u>

Plaintiff argues that the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole because the ALJ failed to articulate a legally sufficient rationale for his conclusion that (a) Plaintiff did not satisfy Listing 112.05 and (b) Plaintiff did not have a marked limitation in the domains of interacting and relating to others and in attending to and completing tasks. The Commissioner disagrees.

<u>Listing 112.05.</u> Listing 112.05, mental retardation, is "[c]haracterized by *significantly* subaverage general intelligence functioning with deficits in adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added). Children of Plaintiff's age satisfy this Listing if they have a marked impairment in at least two of the following age-appropriate functions: cognitive/communicative, social, personal, and maintaining concentration, persistence, or pace. § 112.05A. They may also satisfy the Listing if they have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and [i] a physical or other mental impairment imposing an additional and significant limitation of function," [ii] marked impairment in social or personal functioning or in maintaining concentration, persistence, or pace, or [iii] a marked impairment in cognitive/communicative functioning and "a physical or other mental

impairment imposing an additional and significant limitation function." § 112.05D, E. The IQ scores in § 112.05 reflect values from tests of general intelligence, such as the Stanford-Binet or Wechsler series, that have a mean of 100 and a standard deviation of 15. § 112.00(D)(9).

Plaintiff contends that he satisfies Listing 112.05 because he has a valid verbal IQ score of 69 and a severe receptive and expressive language disorder. This was the lowest of Plaintiff's IQ scores. In the same test, he had a nonverbal IQ of 84 and a full scale IQ of 76. Six months later, on different test, he had a verbal IQ of 74, a nonverbal IQ of 86, and a full scale IQ of 78. On the Leiter test, he had a full scale IQ of 90. The earlier tests were given before he had begun speech therapy sessions at Cardinal Glennon's or been provided with language therapy sessions at school.

An IQ score may be rejected if it is inconsistent with the record as a whole. **Scott**, 529 F.3d at 824; **Johnson v. Barnhart**, 390 F.3d 1067, 1071 (8th Cir. 2004); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). For instance, in **Neal ex rel. Walker v. Barnhart**, 405 F.3d 685, 689 (8th Cir. 2005), the court affirmed an ALJ's determination that a child who had a verbal IQ of 76, a performance IQ of 58, and a full scale IQ of 65 did not satisfy Listing 112.05. A psychologist had opined that the child's scores "underestimated her cognitive functioning." **Id.** Similarly, Plaintiff's nonverbal IQ score suggested higher cognitive functioning than his verbal IQ score indicated. Later IQ scores of the child in **Neal** were a full scale IQ of 72, a verbal IQ of 82, and a performance IQ of 66. **Id.** at 690. Similarly, Plaintiff's later IQ scores, after receiving speech and language therapy, had

improved. See **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (internal quotations omitted). The child in **Neal** had been diagnosed with borderline intellectual functioning. **Neal**, 405 F.3d at 690. Similarly, Plaintiff's scores on the Wechsler Preschool and Primary Scale of Intelligence – III placed him within the borderline intellectual functioning range. Also, in **England**, 490 F.3d at 1021, the court rejected a claimant's argument that his 2000 verbal IQ score of 65, coupled with other limitations, satisfied Listing 112.05D. His other 2000 IQ scores included a performance IQ score of 82 and a full scale IQ score of 71; his 2001 IQ scores were a verbal IQ score of 77 and a performance IQ score of 77. **Id.** These scores were less than two standard deviations, a standard deviation being 15, below the mean of 100. **Id.** Plaintiff's later IQ scores are of comparable values. Moreover, as noted by speech language pathologist at Cardinal Glennon's, the 12-point difference between his verbal and performance IQs is statistically significant. See **Scales v. Barnhart**, 363 F.3d 699, 704 (8th Cir. 2004) (low IQ scores did not accurately reflect overall intelligence given wide discrepancy between vocabulary and performance IQ scores).

The Court also notes that Plaintiff was specifically not diagnosed with mental retardation following his two-day psychoeducational evaluation. Although a child does not have to be formally diagnosed with mental retardation to satisfy Listing 112.05, see **Scott**, 529 F.3d at 822; accord **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006), and the legal standards for such classification are different than the medical standards, see **id.**, the

specific diagnosis that a child is not mentally retarded is an inconsistency that an ALJ may consider.

In arguing that the ALJ improperly weighed his verbal IQ of 69, Plaintiff emphasizes Dr. Pettipiece's nonresponsive reply that he had a valid IQ score of 74 when the question was whether Plaintiff had a valid verbal IQ score between 61 and 70. It is clear, however, from a reading of the ALJ's decision that he did not accept the IQ score of 69 as controlling because it was inconsistent with the record as a whole. Any citation to Dr. Pettipiece's reply did not affect the outcome of Plaintiff's application. See **Cox v. Astrue**, 495 F.3d 614, 618-19 (8th Cir. 2007) (ALJ did not substitute his "judicial conjecture for ambiguous medical opinion," but recognized "an obvious medical opinion inopportunely attended by superficially distracting or misleading language"; hence, there was no need for further clarification); **Senne v. Apfel**, 198 F.3d 1065, 1067 (8th Cir. 1999) (rejecting claim that ALJ insufficiently explained finding that claimant did not suffer from listed impairment when alleged deficiency had no practical effect on outcome of case). Cf. **Chunn v. Barnhart**, 397 F.3d 667, 672 (8th Cir. 2005) (remanding case when ALJ neither explicitly rejected psychologist's opinion of claimant's IQ, the only such opinion in the record, nor explained why opinion should not be relied on).

Plaintiff further argues that he satisfies the second prong of Listing 112.05D because he has a significant language dysfunction. The second prong, "'a physical or mental impairment imposing an additional and significant limitation of function,' is met when a claimant has a physical or additional mental impairment that has a more than slight or

minimal effect on his ability to [function]." **Rucker**, 141 F.3d at 1260 (quoting § 112.05D; second internal quotation omitted). "The additional impairment need not be disabling in and of itself but need only result in a significant work-related limitation of function to satisfy the adult standard." **Id.** A language dysfunction may impose the required degree of limitation. See **Bailey v. Apfel**, 230 F.3d 1063, 1066 (8th Cir. 2000) (claimant with IQ scores all in 60 to 70 range had an addition mental impairment of a speech disorder; former employer could not understand his speech and tests showed severe articulation disorder). Plaintiff, however, has not satisfied the first prong.

Domains of Functioning. Plaintiff further argues that the ALJ erred by not finding that he had a marked degree of limitation in either the domain of attending to and completing tasks or in the domain of interacting and relating to others.

"When considering the attending and completing tasks domain, the inquiry focuses on how well the child is able to focus and maintain his or her attention and how well the child begins, carries through, and finishes activities." **England**, 490 F.3d at 1022 (citing 20 C.F.R. § 416.926a(h)). "One must also determine the pace at which the child performs activities and the ease with which he changes them." **Id.**

Ms. Brown reported that Plaintiff, then five years old, could stay with a task for thirty minutes. It was reported in his first IEP that he was a hard worker. His mother also reported that he had trouble remembering and concentrating. He was able, however, to sit through an hour of testing before showing any restlessness. Although he sometimes became

distracted, he was easily directed back on track.  His teacher was not concerned about his attention levels.  His mother thought he was doing well in kindergarten.

In the domain of interacting and relating with others, the inquiry focuses on how well the child "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others."  20 C.F.R. § 416.926a(i).

Ms. Brown testified that Plaintiff sometimes played with others in the neighborhood  She later assessed his socialization skills as adequate.  It was reported in his first IEP that he was cooperative and eager to learn.  In a later IEP, completed after Plaintiff had received speech therapy, his strengths included peer interaction and cooperation.  His father reported that he had age-appropriate peer relationships and was not negatively affected in his social development by any speech problems.

Although there is conflicting evidence in the record as to the extent of Plaintiff's limitations in the two cited domains, there is substantial evidence to support the ALJ's conclusion that he did not have a marked limitation in either.[14]

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's

---

[14]This finding is supported by the assessment of Plaintiff's GAF as 62, indicative of only some difficulty in school or social functioning.  See note 10, supra.

decision, to support the Commissioner's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of September, 2009.